IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN MATTHEW JAMISON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 04-1568-KAJ** |
| v. | : | |
| | : | |
| THOMAS P. GORDON, individually | : | |
| and in his official capacity; | : | |
| SHERRY FREEBERY, individually | : | |
| and in her official capacity; | : | |
| COLONEL JOHN L. CUNNINGHAM, | : | |
| RETIRED, individually; | : | |
| COLONEL DAVID F. MCALLISTER, | : | |
| individually and in his | : | |
| official capacity; and | : | Trial By Jury Demanded |
| NEW CASTLE COUNTY, | : | |
| a municipal corporation, | : | |
| | : | |
| | : | |
| Defendants. | : | |

<u>**FIRST AMENDED COMPLAINT**</u>[1]

1.  Plaintiff, a Captain in the New Castle County Police Department("NCCPD"), brings this action to remedy violations of his civil rights.  On a number of occasions plaintiff spoke out on matters of public concern.  As a result he was retaliated against in violation of his First Amendment rights under the United States Constitution.  This retaliation took the form of failing to promote him to Colonel, Lieutenant Colonel, and/or Major.  It also resulted in a significant curtailing of his

---

[1]This amended complaint is filed as of right under Rule 15(a).  Any new underlining is what has been added and anything in brackets has been deleted.

duties, responsibilities and privileges as a Captain and denial of training. Moreover, Plaintiff also was discriminated against due to his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.

## I.   JURISDICTION AND VENUE

2.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the U.S. Constitution. The cause of action arises under 42 U.S.C. § 1983. This action also arises under the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621 et seq. ["ADEA"]. The claims arose in this judicial district.

3.   Plaintiff also has filed timely charges of age discrimination with the Equal Employment Opportunity Commission ("EEOC")under the ADEA. [Plaintiff has requested a Right to Sue letter from the EEOC and anticipates receiving it shortly.] Plaintiff received the right to sue letter on March 15, 2006. Plaintiff hereby amends his complaint within 90 days to further perfect said claim.

## II.   THE PARTIES

4.   Plaintiff Captain Matthew Jamison is a citizen of the United States and a resident of New Castle County, Delaware. For over 20 years he has been employed as a police officer for the municipal defendant, having been hired on or about March 20,

1984.  He was born on July 10, 1961.          He presently
holds the rank of Captain.  At all times material hereto he has
been a diligent, honest and loyal employee who always performed
his job in an exemplary manner.

5.   Defendant Thomas P. Gordon ("Gordon"), at all times
material hereto, has been the incumbent County Executive of
defendant New Castle County ("NCC" or"County").  He is sued in
his individual and official capacities for retaliatory actions
under 42 U.S.C. § 1983 which were taken against plaintiff. Since
individuals cannot be sued under the ADEA, he is not included as
a defendant for the purposes of violation of that Act.

6.   Defendant Sherry Freebery ("Freebery"), at all times
material hereto, has been the Chief Administrative Officer
("CAO") of the County.  She is sued in her individual and
official capacities for retaliatory actions under 42 U.S.C. §
1983 which were taken against plaintiff.  Since individuals
cannot be sued under the ADEA, she is not included as a defendant
for the purposes of violation of that Act.

7.   Defendant John L. Cunningham ("Cunningham") was the
Colonel and highest ranking officer of the New Castle County
Police Department ("NCCPD") through June of 2003.  He is sued in
his individual capacity for retaliatory actions under 42 U.S.C. §
1983 which were taken against plaintiff prior to his retirement.
 Since individuals cannot be sued under the ADEA, he is not
included as a defendant for the purposes of violation of that

—3—

Act.

8.    Defendant David F. McAllister ("McAllister") has been
the Colonel of the NCCPD since July 29, 2003.  He is sued in both
his individual and official capacities for retaliatory actions
under 42 U.S.C. § 1983 which were taken against plaintiff after
he became Colonel.  Since individuals cannot be sued under the
ADEA, he is not included as a defendant for the purposes of
violation of that Act.

9.    Defendant New Castle County is a municipal corporation
under the laws of the State of Delaware which employs
significantly more than 500 employees.  It is included as a
Defendant for the purposes of the ADEA.  It is included as a
Defendant under 42 U.S.C. § 1983 as well, but not for punitive
damages.

### III. <u>FACTS GIVING RISE TO THE ACTION</u>

#### A. GORDON AND FREEBERY'S TOTAL CONTROL OF THE NCCPD

10.    During the operative time frame, Gordon and Freebery
made all personnel and promotion decisions for the NCCPD, and
otherwise whenever they wished would exercise total control of
the day to day operations of the Department.  They and the County
also have a policy, custom and practice of retaliating against
their opponents within the NCCPD.

11.    For example, defendant Cunningham on December 16, 2003
plead guilty in Superior Court to the crime of conspiracy in the

third degree, in violation of Title 11 section 511 of the
Delaware Code.  Therein he admitted that during August 2002 he
agreed with defendant Freebery that one or both of them would
engage in the crime of official misconduct in violation of 11
Delaware Code § 1211(2).  To that end and out of fear of the
personal consequences he would suffer at the hands of defendant
Freebery, he pressured subordinate police officers to work during
both working and non-working hours on the 2002 political
campaigns of Patti Powell and William Tansey, two  Council
members of the County who defendants Gordon and Freebery sought
to control.

12.    In writing in his guilty plea, defendant Cunningham
further admitted that he pressured police officers to work on the
Powell and Tansey campaigns "because he was directed to do so by
his boss ... Sherry L. Freebery, and because he reasonably feared
that if he did not comply with Ms. Freebery's directive he would
suffer consequences that would significantly and negatively
affect his employment."

13.  As another example of Gordon and Freebery's total
control over the operations of the NCCPD, in retaliation for free
speech on a matter of public concern, on or about June 12, 2001
Freebery also directed and caused a D.M., a County police
officer, to violate the criminal law and access the classified
DelJIS criminal records computer database to see if a citizen who

had written a public letter critical of defendants Gordon and
Freebery had a criminal record.

### B. PLAINTIFF'S PROTECTED SPEECH

#### (1)  The Hit-and-Run Accident Coverup for Freebery's Son

14.    Defendants covered up the fact that Freebery's son, Patrick Duffy, was
involved in a hit-and-run motor vehicle accident on Friday November 30, 2001, at 11:35
pm. Freebery's son fled the scene of a hit-and-run accident and
drove to the residence of his mother, defendant Freebery.

15.    The Shift Commander of Patrol Squad E contacted
Plaintiff and informed him that a hit and run had occurred and
that Freebery's son was the primary suspect.  Plaintiff told the
Shift Commander to conduct a complete investigation irrespective
of who was the mother of the hit-and-run driver. Plaintiff
ordered the Shift Commander to uphold the law which treats all
citizens equally, even if they are a high public official or a
member of their family.  Refusing to grant any special favors, he
ordered the shift Commander to proceed as he would with any other
hit-and-run accident investigation.

16.    Plaintiff then telephoned defendant Cunningham, who
at the time was the Colonel of the NCCPD and informed him that
the shift Commander would be conducting a by the book
investigation into the matter. Cunningham informed Gordon and
Freebery of plaintiff's speech and orders, which angered them.

17.  The hit-and-run accident occurred on Yorklyn Road,

—6—

approximately a half mile from its intersection with Route 41 in
the vicinity of the NVF Plant.

18.    The motorist whose vehicle was struck pursued Duffy
past the intersection before telephoning the police to report the
hit-and-run accident and also Duffy's Delaware license tag
number.

19.    County police officers responded to the scene of the
hit-and-run accident.

20.    The officers found pieces of broken glass from an
automobile taillight lens and other debris characteristic of a
motor vehicle accident.

21.    The officers also ran a computer check of the tag
number.

22.    The computer check revealed that the fleeing vehicle,
which was a 1998 Ford Expedition, was registered to Freebery and
her son, Patrick Duffy, with an address located on Ramunno
Circle, Hockessin, DE.

23.    Accordingly, the officers responded to Freebery's
residence on Ramunno Circle.

24.    Outside her residence, the officers found tire tracks
across her next-door neighbor's front lawn that led toward
Freebery's garage door where the vehicle was locked inside.

25.    Outside the garage in the driveway a County vehicle
with a warm hood was parked.  Its driver had obviously just

arrived and rushed inside the home.

26.    The officers knocked on Freebery's door, but no one would answer.

27.    The officers then telephoned Freebery's residence, but still no one answered, even though the hood was warm on the County vehicle parked in the driveway.

28.    Inside Freebery's residence, all the lights were turned off and there was no sign of anyone.

29.    No one answered the door or the phone.

30.    There was no  search warrant or exigent circumstances to justify a forced entry into the residence.

31.    So the officers then returned to the Minquadale Police Station to properly preserve and record the physical evidence, such as the broken auto tail light lens which could be matched up with the vehicle in Freebery's garage to which the police did not have access.

32.    The accident debris and physical evidence was secured in evidence in accord with departmental procedures.

33.    Defendant Cunningham ordered the Shift Commander via another Captain just to clear the scene of the accident and to do nothing further.

34.    Approximately four hours after the officers had left her home, and after it was too late to administer a reliable sobriety test on the driver of the vehicle, Freebery telephoned

the Lieutenant's office from her residence and spoke to the Shift Commander.

35.  She claimed that she had been asleep the whole time and when she awoke she found a message on her answering machine.

36.  Doing his duty, the Shift Commander then demanded to speak with her son, but she claimed that he was asleep and she refused to cooperate in the criminal investigation.

37.  Then in response to the Shift Commander's demand to have officers interview her son the following evening, she refused again and claimed that he had a date with his girlfriend. She finally agreed that he would report to the police station on the second evening after the hit-and-run accident.

38.  But when that date arrived, Freebery's son telephoned the Police when the Shift Commander was not yet on duty, left a message, and claimed that he could not make it to the station that evening and so they would have to re-schedule his interview.

39.  Finally, after the trail was cold and any physical damage could have been secretly repaired, Freebery's son reported to the police station with the vehicle on the third evening after the hit-and-run accident.

40.  The vehicle still had scuff marks consistent with the damage to the victim's vehicle.  But the auto tail light lens was intact.  However, with the three day delay damage to the vehicle secretly could have been repaired.

41.  Defendant Cunningham then ordered the criminal investigation terminated approximately one week after the hit-and-run accident and he left the hit-and-run victim to his civil law remedies.

42.  Later, Duffy contacted the victim and offered to pay for the damage to the victim's vehicle.

43.  No charges were ever brought against Freebery's son for the hit-and-run accident.  He could have faced charges of leaving the scene of an accident, failure to report an accident, reckless driving and even driving under the influence.

44.  Defendants held it against plaintiff that he told the Shift Commander to handle the matter by the book.

**(2) Ranking Architectural Firms for New NCCPD Headquarters.**

45.  In early 2002, Plaintiff was assigned to a panel to identify which firm should be hired to provide architectural services for the building of a new County government center building which would house a new County Police Headquarters.  As such, he interviewed individuals concerning what they thought they needed in the new building.

46.  Thereafter, he spoke with defendant Freebery about the project.  She vehemently chastised him for asking people what they thought was necessary in a new police Headquarters and emphasized that she did not want anything written down concerning the project.

47.  On or about May 9, 2002, operating within his chain of command, plaintiff filled in and faxed to Major Wayne Merritt his evaluation rankings concerning which architectural firm should be hired for the project.

48.  Then Major Merritt telephoned plaintiff and told him that it was important that a particular firm be rated higher than any of the others, implying that county officials above Major Merritt's authority wanted a particular firm to receive the contract.  Upon information and belief, Defendant Freebery's niece worked for that particular firm.

49.  Plaintiff informed Major Merritt that he had already filled and faxed his evaluation ratings, ranking a different firm highest, and he refused to change his rankings.  Freebery and Gordon learned of plaintiff's speech and conduct, which angered them.

50.  Thereafter plaintiff was taken off the expansion project by defendants.

**(3)    Speaking Out - General Accounting Principles at P.A.L.**

51.  After being assigned to the Police Athletic League ("PAL"), plaintiff was encouraged to provide blank checks to PAL Board member Scott Phillips, a friend of defendants Gordon and Freebery.  He refused to do so, stating that as a matter of policy and general accounting principles it would be a mistake to

–11–

provide any civilian with NCCPD blank checks concerning PAL. Gordon and Freebery learned of plaintiff's speech and conduct, which angered them.

**4)    Speaking Out - Traffic Enforcement Assignments.**

52.  After defendant McAllister became the Colonel in late July of 2003, he changed traffic enforcement assignments. Speaking out on a matter of public concern, Plaintiff communicated both in writing and orally to McAllister that there was insufficient staffing for traffic enforcement, which previously had four or five officers including a Sergeant assigned to it and which had been decreased under McAllister's reassignments to only three patrolman.

53.  On or about August 19, 2003, plaintiff provided a memo to Colonel McAllister concerning the Traffic Service Units' staffing, recommending that the NCCPD needed to have at least four officers assigned to the Traffic Unit.  Defendant McAllister only wanted three officers to be assigned to the Traffic Services Unit, which previously had five, including a Sergeant.

54.  McAllister's actions also were in violation of long-standing NCCPD policies and practices.

55.  Gordon and Freebery learned of plaintiff's speech which antagonized them.

56.  By its content, form and context, at all times plaintiff spoke out about matters of public concern.

### C. THE NON-DISRUPTIVE NATURE OF PLAINTIFF'S SPEECH.

57. All of plaintiff's speech was non-disruptive of any legitimate interest of his employer and was on matters of public concern to the County, as well as the General Assembly, the Governor of Delaware, the U.S. Attorney, the F.B.I., the I.R.S., New Castle County Council, the news media, voters and the public at large. His speech related to matters of political, social and other concern to the community.

58. Plaintiff was acting in good faith and with honest motive at all times when he exercised his First Amendment rights to freedom of speech. At all times, plaintiff believed that his speech was true.

59. Plaintiff was not being disloyal by speaking out.

60. The public concern in and value to the community at large of being free to hear plaintiff's speech outweighs any asserted government interest in the effective and efficient provision of services.

61. Nothing plaintiff said interfered with the regular operations of the NCCPD. Plaintiff's speech did not interfere with the Department's interests in: crime fighting; fostering trust and confidence among officers; protecting the safety of officers or other members of the community.

62. Plaintiff's speech did not threaten the authority of the Colonel to run the Department. Nothing plaintiff said damaged his relationship with any superior officer. Plaintiff did not impugn the integrity of his supervisors.

63. Plaintiff's speech did not have a detrimental impact on any close working relationship for which personal loyalty, trust and confidence are necessary. Plaintiff is not the alter ego of defendants.

−13−

64.  Any disruption that was caused was not caused by plaintiff's speech but was instead caused by the very problems that plaintiffs' speech was in fact intended to address - illegal conduct and/or bad policy.

65.  In his position as a Captain, plaintiff did not make or formulate County policy. Rather, formulation of County policy is left up to others.

66.  The individual defendants were aware of plaintiff's protected speech, described above, and it angered and antagonized them.

### D.  PLAINTIFF'S CAREER PATH PLUMMETS AS HE SPEAKS OUT AND GROWS OLDER.

67.  Within three months of telling the Shift Commander to investigate defendant Freebery's son, in February of 2002, defendants reassigned plaintiff to Building Maintenance and Information Systems.  Prior to this reassignment, plaintiff stated specifically to defendant Cunningham that he did not want to be assigned to PAL or to Building Maintenance and Information Systems.

68.  Within seven months of not ranking a particular architectural firm as the highest firm for building expansion purposes, in January of 2003 defendants reassigned plaintiff to supervise PAL.  Also at this time he was assigned to the Traffic Services Unit and the Mounted Patrol and K-9 Unit.

69.  When defendant McAllister became the Colonel he asked plaintiff to provide him with requests as to where plaintiff should be assigned.  Plaintiff specifically indicated to McAllister that he did not want to supervise PAL.  But within a month of when defendant McAllister became the Colonel, plaintiff was assigned to PAL solely. His Traffic Services Unit and Mounted Patrol and K-9 Unit assignments were taken

away from him.

70.  Upon questioning, defendant Cunningham and defendant McAllister contradicted each other to plaintiff, telling him that the other was responsible for plaintiff's decreased role with the NCCPD.

### E. THE PROMOTION TO COLONEL

71.  A vacant Colonel/Chief of Police position was posted in June of 2003, and an interview panel held interviews in early to mid July of 2003.

72.  Prior to the Colonel/Chief of Police selection process, a number of Lieutenants were interviewed by defendant Freebery.  Upon information and belief, none of the Captains were interviewed.  Plaintiff certainly was not interviewed.

73.  On or about May of 2003, the law regarding the Colonel position, required that a police Captain or above be the only NCCPD employees considered for the position.  That law was changed without notice by County Council at the behest of defendants Freebery and Gordon.  The pretextual reason given was that qualified outside candidates then could apply and expand the field of qualified applicants.  Right after the County Council meeting ended, defendant McAllister, who at the time was only a first year Lieutenant, and defendant Freebery hugged each other.

74.  Upon information and belief, the Colonel position was not advertised, and there was only one outside applicant, retired NCCPD Major Joseph Bryant.

–15–

75.     A three member Interview Board met with applicants for the Colonel position in early July of 2003.  The Interview Board was not a neutral body.  Retired Major Wayne Merritt worked for Gordon and Freebery in a high ranking Special Services position.  Tim Mullaney was the County attorney and worked for Gordon and Freebery, reporting directly to defendant Freebery. Robert McDonald was a contract attorney for the County.  Thus, each board member was subject to control by Gordon and Freebery.

76.     Plaintiff applied for the Colonel position and was interviewed by the three member Interview Board.

77.     On or about late July or early August of 2003, Defendant David McAllister (age 34) was selected and hired as the Colonel of the NCCPD.  Only four years prior to this hire, McAllister was not even a Sergeant.

78.     Afterwards, plaintiff requested his scores by the Interview Panel.  He did not receive the scores, but the summary that was explained to him by Patty DiEmedio indicated that he was considered to be "capable, loyal and that his presentation was well received. The only negative aspect of this oral summary was that he needed to be "more forward thinking," a euphemism meaning "be younger."

79.  New Colonel McAllister asked plaintiff to prepare some directional plans for the NCCPD and to identify his personal preferences for transfer.  His requests were all ignored, and

plaintiff retained only the portion of his Command with which he was dissatisfied.

80.   One of the first times Colonel McAllister addressed the executive staff as a group, he repeated many of the cornerstones of plaintiff's presentation to the Colonel Interview Board (i.e. focus on patrol, executive staff to ride with officers, take a close look at officer retention, abandon the CrimeStar process, etc.)

81.   In reality, defendants Gordon and Freeberry made the decision to promote Lt. McAllister to the rank of Colonel.

82.   Alternatively, Gordon ratified, sanctioned, approved, acquiesced in, permitted or authorized Freebery's decision to promote McAllister.

### F.   FURTHER ADVERSE ACTION

83.   On or about September 22, 2003, plaintiff was stopped at Headquarters in the afternoon and advised by Captain Stu Snyder that Colonel McAllister had just given the order for Lori Kane to take plaintiff's work station at Headquarters.  From that time forward, plaintiff has not had a desk or work area at Police Headquarters.  Upon information and belief, plaintiff is the only Captain to have no desk or work area at Police Headquarters.

84.   On September 30, 2003 plaintiff was handed an employee performance evaluation by defendant McAllister.  The evaluation rated Plaintiff as unsatisfactory in every category.  Previously,

he had never been given an unsatisfactory in a NCCPD performance evaluation for any category, let alone every category.  The purpose of the evaluation was to disqualify plaintiff from two upcoming promotions.

85. As a result of this evaluation, plaintiff was placed on a 90-day probation.

86. On or about November 10, 2003, plaintiff provided a response to Colonel McAllister concerning the evaluation he had given to plaintiff.  Eventually it was changed, but not until after the following promotions to Lt. Colonel and Major were made.

## G.  THE PROMOTION TO LIEUTENANT COLONEL

87.  This unsatisfactory evaluation was nothing more than a pretextual attempt to make it impossible for plaintiff to be hired for the Lieutenant Colonel and Major positions which were filled just prior to the end of the 90-day probation period, to force plaintiff to retire, to damage any future prospects plaintiff might have of promotion, and to set plaintiff up for termination.

88.  Plaintiff applied for the Lieutenant Colonel position but was not promoted.

89.  Defendants did not hold an interview Board for the Lieutenant Colonel position.

90.  Instead, Defendant McAllister, acting at the behest of

Defendants Freebery and Gordon, appointed former Captain Scott McLaren to Lieutenant Colonel on December 19, 2003.    91.    In reality, defendants Gordon and Freeberry made the decision to promote Captain McLaren to the rank of Lieutenant Colonel.

91.    Alternatively, Gordon ratified, sanctioned, approved, acquiesced in, permitted, or authorized Freebery's decision.

## H. THE PROMOTION TO MAJOR

92.    Similarly, Plaintiff applied for the Major position but was not promoted.

93.    Defendants did not hold an interview Board for the Major position.

94.    Instead, Defendant McAllister, acting at the behest of Defendants Freebery and Gordon, appointed former Captain Stu Snyder to Major on December 19, 2003.

95.    In reality, defendants Gordon and Freeberry made the decision to promote Captain Snyder to the rank of Major.

96.    Alternatively, Gordon ratified, sanctioned, approved, acquiesced in, permitted, or authorized Freebery's decision.

## I.  PLAINTIFF'S QUALIFICATIONS

97.    Plaintiff presently is 43 years old and he has been employed by the County as a police officer for over 20 years.

98.    Plaintiff holds a Bachelor of Science Degree in Business Administration (Management Concentration) from York College of Pennsylvania, which he obtained in May 1983.  He

completed a three week Senior Management Institute for Police training course in June of 1999. He completed Pennsylvania State University Polex Training in 1994. He became a Master Police Instructor in 1994. In addition, he has taken over 25 courses and seminars in law enforcement, supervision, leadership and related areas.

99. He has held a supervisory position since September of 1993, when he was promoted to Sergeant. As a Sergeant he commanded a squad of patrol officers while assigned to various reporting areas throughout the County. He oversaw two community policing project areas. Then he commanded the Fiscal Control Unit, including civilian employees and police assigned therein while preparing the annual budget and related financial plans.

100. In May of 1996 plaintiff was promoted to Lieutenant. As a Lieutenant, he served two years as a patrol platoon commander and was the Magistrate Court Liaison. Thereafter he served as the Risk Manager and Executive Police Correspondent for the agency.

101. In December of 1998 he was promoted to Captain. During his time as a Captain, he has operated as the Administrative Support Section Commander, Criminal Investigations Section Commander, Southern Patrol District Commander, and Administrative Services Section Commander.

102. Plaintiff has been a Certified Police Instructor since

1990, and a Master Police Instructor since 1994. As such, he has participated in the certification of three Certified Police Instructor classes and numerous police academy classes.

103. Moreover, he aided in the development and implementation of a new shift schedule for the NCCPD, successfully implemented numerous risk management initiatives, and prepared both the community policing enhancement and anti-racial profiling policies for the Department. Furthermore, he has specific expertise in police planning and financial management.

104. Professionally, he served as the NCCPD's representative on the DELJIS Board of Managers, is a member of the Police Executive Research Forum (P.E.R.F.) and the International Association of Chiefs of Police (I.A.C.P.). He has served as the Executive Director of PAL, participated in every Law Enforcement Torch Run since the inception of the event, and directed the NCCPD's participation therein for four years. He has participated in every Concerns of Police Survivors (C.O.P.S.) Run since the event was initiated and coordinated the NCCPD's participation in it for three years. He has also served on the Delaware Task Force on Driver Distraction, New Castle County Police Awards Committee (3 years) and the Delaware Towing Association.

105. As an NCCPD officer for 20 years, he has received

numerous commendations.

106.  With the exception of the recent retaliatory
evaluation by defendant McAllister, Plaintiff's performance
evaluations have always been above average or better.

### J.  CIRCUMSTANTIAL EVIDENCE OF RETALIATORY MOTIVE

107. Lieutenant McAllister was less qualified than plaintiff
for promotion to Colonel.

108. Captain Scott McLaren was less qualified than plaintiff
for promotion to Lieutenant Colonel.

109. Captain Stu Snyder was less qualified than plaintiff
for promotion to Major.

110.  The County also violated its own rules regarding the
time to commence oral board testing.

111.  In a specific attempt to scare plaintiff into silence,
defendants also transferred plaintiff to the Southern Patrol Unit's Headquarters in
Middletown, Delaware on or about January 5, 2004.

### K. RETALIATORY AND/OR ADVERSE ACTIONS AGAINST PLAINTIFF

112.  As a result of plaintiff's protected speech,
defendants retaliated against him in numerous ways.

A.     Plaintiff was denied promotion to Colonel.

B.     Plaintiff was denied promotion to Lieutenant Colonel.

C.     Plaintiff was denied promotion to Major.

D.   Plaintiff was denied a desk and work space at police headquarters.

E.   Plaintiff was involuntarily transferred to Building Maintenance and PAL.

F.   Plaintiff was involuntarily transferred to the Southern Patrol Unit.  Upon information and belief, he is the only Captain ever to be assigned to the Southern Patrol Unit, which typically is commanded by a Lieutenant.

G.   Plaintiff's duties and responsibilities were diminished so his only assignment was PAL - an assignment which he indicated he did not want.

H.   Plaintiff was denied training opportunities, such as the Planning, Designing and Constructing Police Facilities Seminar in September of 2002, March of 2003, May of 2003, and August of 2003, along with the International Association of Chiefs of Police Law Enforcement Education & Technology Exposition.

113.  The totality of retaliatory adverse action taken by defendants against plaintiff is sufficient to deter a person of ordinary firmness from exercising his First Amendment rights to free speech.

114.  A reasonable person of ordinary firmness would be deterred from exercising his First Amendment rights to speech   when threatened with denial of promotions to Colonel, Lt. Colonel and/or Major; involuntary job transfer to less desirable positions; alteration of job responsibilities and denial of training.

L.   THE CAUSAL LINK BETWEEN SPEECH AND ADVERSE ACTION

115.   There is a causal link between First Amendment protected activity on matters of public concern and numerous adverse actions.

116.   First Amendment protected activity was a substantial or motivating factor in defendants' failure to promote plaintiff.

The natural probative force of the evidence demonstrates causation.

117.   The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation, plaintiff would have been denied a promotion anyway.

### M. PLAINTIFF'S INJURIES

118.   As a direct and proximate result of the actions of the defendants as detailed herein, plaintiff has or will suffer lost or reduced wages and earnings, diminished earning capacity now and upon his retirement, lost or reduced County pension and benefits, including but not limited to lost wages, clothing allowance, professional time, shooting days, pension and other benefits of being a Colonel, Lieutenant Colonel and/or Major, decreased employment and earnings opportunities and other pecuniary losses, emotional pain, suffering, anger, disappointment, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, physical injury, anguish, humiliation, embarrassment, injury to reputation and other pecuniary and non-pecuniary losses and injuries.

### IV.   ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

119.   The individual defendants' actions violated clearly established federal constitutional rights of which any reasonable official would have known, including three decades of Third Circuit and Supreme Court case law prohibiting retaliation

against public employees for protected speech.

120.  At all times material hereto, the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above which illegally retaliated against plaintiff.

121.  At all times material hereto, the individual defendants and their agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable to the County.

122.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

123.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

124.  Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

125.  Their actions were wanton and malicious or taken with reckless indifference to federal constitutional rights.

126.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiff.

127.  The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to plaintiff.

128.  The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

129.  The individual defendants' actions were willful, reckless and oppressive.

130.  The defendants' actions were motivated by bias, bad faith, and improper motive.

131.  The defendants' actions constituted an abuse of governmental power.

132.  The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

133.  The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

134.  The actions of the defendants were taken pursuant to County policies, customs and/or practices and were authorized, sanctioned, implemented, permitted, and ratified by officials functioning at a policy making level.

135.  By the policy, custom, and/or practice of officials functioning at a policy making level, the defendants have retaliated against plaintiff.  That policy, custom and/or

practice caused a deprivation of constitutional rights. Additionally, the defendants must have known, or reasonably should have realized, from the nature of their conduct that their policy, custom and/or practice was causing or was likely to cause violations of federal constitutional rights.

### COUNT I (FREE SPEECH CLAUSE)

136.    Plaintiff repeats and re-alleges paragraphs 1-135 set forth above.

137.    The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for plaintiff's First Amendment protected speech on matters of public concern. There is a temporal and causal relationship between plaintiff's aforementioned protected speech, and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action.  The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have denied plaintiff a promotion to Colonel, Lt. Colonel and/or Major.

138.    As a direct and proximate result of the actions of the defendants as detailed herein, plaintiff suffered and is suffering lost wages, lost pension, and lost benefits, decreased employment opportunities, emotional pain, suffering, inconvenience, mental aguish, loss of enjoyment of life, mental and physical pain and aguish, humiliation, embarrassment and

–27–

other permanent injury and pecuniary and non-pecuniary losses.
Plaintiff has not been able to accumulate as large a pension as
he would have had the defendant not discriminated against him.

139.  Plaintiff's constitutional right to freedom of speech
under the First Amendment of the U.S. Constitution and 42 U.S.C.
§ 1983 has been denied.

<u>**COUNT II (AGE DISCRIMINATION)**</u>

140.  Plaintiff repeats and re-alleges paragraphs 1- 139 set
forth above.

141.  The Colonel position became vacant.

142.  Plaintiff was qualified for the Colonel position.

143.  Plaintiff applied for the Colonel position.

144.  Plaintiff was over 40 years old when the Colonel
position was filled.

145.  The Colonel position was filled by a less qualified
substantially younger person, namely defendant McAllister.

146.  On or about August 22, 2003, retired Major Wayne
Merrit, a member of the Interview Panel for the Colonel position
spoke with Kimberly Mitchell about the process used to pick
Lieutenant David McAllister as the Colonel.  He said that they
wanted someone younger and because all of the Captains and Majors
were near or above twenty years of service they were not
considered.  Defendants wanted to begin a youth movement
concerning the upper echelon supervisors within the NCC Police

Department.    Therefore, McAllister was picked as the new Colonel.

147.   Plaintiff was not promoted to the Colonel position due to his age.

148.   Any alleged non-discriminatory reasons for the treatment of plaintiff are a pretext for discrimination. Alternatively, there is direct evidence of illicit discrimination and mixed motive analysis is applicable.

149.   The motivating or determinative reason for the treatment of plaintiff was his age. Any other reasons given by the defendant County are a pretext for discrimination.

150.   The defendant County cannot establish that it would have made the same employment decisions concerning plaintiff if it had not been partly motivated by a discriminatory reason. According to mixed motives analysis, the actions taken against plaintiff are impermissively tainted.  Absent that taint the defendant County cannot prove that it would not have promoted plaintiff.

151. In the alternative, any reasons provided by the defendant County for the treatment of plaintiff are pretextual and a cover-up for age discrimination.

152.   The defendant County's discrimination against plaintiff was also willful under the ADEA.  Accordingly plaintiff is entitled to recover punitive and/or statutory liquidated damages.

153.  As a direct and proximate result of the actions of the defendant County and its agents as detailed herein, plaintiff suffered and is suffering lost wages, lost pension, and lost benefits, decreased employment opportunities, and other permanent injury and pecuniary losses. Plaintiff has not been able to accumulate as large a pension as he would have had the defendant not discriminated against him.

**WHEREFORE**, plaintiff prays that the Court:

(A)   Enter judgment against the individual defendants, jointly and severally.

(B)   Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiff's constitutional and ADEA rights.

(C)   Enter a judgment against the defendants, jointly and severally, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

(D)   Enter separate judgments against the individual defendants for punitive damages.

(E)  Issue a mandatory injunction directing defendant County to promote plaintiff to the rank of Colonel, Lt. Colonel or Major in the NCCPD.

(E)   Award front pay until plaintiff can be promoted.

(F)   Issue a reparative injunction directing that upon retirement plaintiff's pension and other benefits be calculated as if he had been promoted to the rank of Colonel as of July 29, 2003 or to Lt. Colonel or Major as of

December 19, 2003.

(H)     Issue a mandatory injunction ending the continuing
        illegal actions of defendants and barring them
        from considering protected speech whenever
        considering the promotion or transfer of any
        uniformed officer of the NCCPD.

(I)     Issue a mandatory injunction ending the continuing
        illegal actions of defendants Gordon and Freebery,
        and their agents, and barring them from
        interfering or participating in any way whatsoever
        in the promotion or transfer process of the NCCPD.

(J)     Enjoin the defendants from retaliating against plaintiff.

(K)     Award plaintiff attorney's fees, costs and pre and post judgment interest
        for this action.

(L)     Enter judgment against the defendants for liquidated, compensatory,
        and/or punitive damages for violation of plaintiff's rights.

(M)     Require such other and further relief as the Court deems just and proper
        under the circumstances.


                    **MARTIN D. HAVERLY, ATTORNEY AT LAW**

                    /s/Martin D. Haverly
                    **MARTIN D. HAVERLY, ESQUIRE (#3295)**
                    Two East 7th Street
                    Suite 201
                    Wilmington, Delaware 19801

                            –31–

(302) 655-2255

Attorney for Plaintiff

Dated: June 12, 2006

## <u>CERTIFICATE OF SERVICE</u>

I, Martin D. Haverly, being a member of the bar of this Court do hereby certify that on

June 12, 2006, I had the **FIRST AMENDED COMPLAINT**,  electronically filed with the Clerk

of the Court using CM/ECF and hand delivery to the following:


        Gregg E. Wilson, Esquire
        County Attorney
        New Castle County Law Department
        87 Reads Way
        New Castle, DE 19720


        <u>/s/ Martin D. Haverly</u>
        **MARTIN D. HAVERLY, ESQUIRE**


cc: Capt. Matthew Jamison